UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| MARJORIE YOUNG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:16-CV-80 (CEJ) |
| | ) | |
| NANCY A. BERRYHILL,[1] Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On June 7, 2013, plaintiff Marjorie Young filed applications for a period of disability, disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*., and for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of October 17, 2011. (Tr. 233-38, 239-45). After plaintiff's applications were denied on initial consideration (Tr. 164-68), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 172-23, 174-76).

A video hearing was held on September 19, 2014. (Tr. 74-128). The ALJ issued a decision denying plaintiff's applications on December 8, 2014. (Tr. 11-30). The Appeals Council denied plaintiff's request for review on February 16, 2016. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

In a Disability Report dated June 7, 2013 (Tr. 275-83), plaintiff reported that she had stopped working on October 7, 2012 and was unable to work due to the following conditions: post-traumatic stress disorder (PTSD), severe depression, panic attacks, bad vision, ulcer in right eye, three concussions in 2006, negative neck curvature, scoliosis, torn sheath of the left chest muscle, lumbar disk displacement, neck and back spasms, "degloving" damage to the left hand and arm, diabetes, high cholesterol, elevated blood pressure during episodes of psychosis, broken teeth, toenail fungus, weak bladder, periodic chest pains, pain and limited movement of the right thumb, plantar wart, sore hip joints, possible sleep apnea, insomnia, and nerve damage in the arch of the left foot. She completed three years of college and was trained as a licensed manicurist. She had worked as a substance abuse technician, a heavy equipment operator, a limousine driver, a pipeline oiler, and a phone clerk. Plaintiff was prescribed the antidepressant citalopram.

In a Function Report dated June 20, 2013, (Tr. 284-94), plaintiff reported that she lived alone in an apartment. In response to a question about her daily activities, plaintiff stated that she engaged in prayer and meditation, ate meals, attended to her personal hygiene, washed dishes, and took a short walk or tended to errands with family members. Her sleep was disturbed by anxiety and pain in her hips, back, and neck. Each week, she prepared two complete meals which she supplemented with sandwiches, canned soups, and frozen foods. She cleaned her kitchen and bathroom, swept floors, and did laundry. At the time she completed the report, she could read for 15 minutes before her eyes began to hurt. She was able

to watch television without limitation. She visited with family at home or while doing errands. She walked to church with a neighbor three times a week.

Plaintiff stated that she had previously been a heavy equipment operator but was no longer able to climb, sit, stand or lift. She had limited use of her left arm and hand and suffered pain in her right thumb due to overuse. She felt unable to cope with her anxiety and PTSD. She had difficulty communicating and calming herself. She had no energy, her reactions were dulled, and she could not concentrate. She complained of an inability to see clearly. She had difficulty sleeping due to pain, a frequent need to urinate, and disturbing thoughts. She was able to pay bills, count change, and manage a checkbook, money orders, and a savings account. Plaintiff had difficulties with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, climbing stairs, seeing, remembering, completing tasks, concentrating, following instructions, using her hands, and getting along with others. She was able to walk about 150 yards before she needed to return home, due to pain. She could generally follow written instructions, but often needed clarification of spoken instructions. She did not always get along with police officers but had never been fired because of conflict with others. She liked to plan things out and sudden changes in routine caused a great deal of tension. She described an extensive history of sexual, physical, and emotional abuse, as well as a pattern of tense interactions in the workplace.

The record contains a letter from plaintiff's older sister, who reported that plaintiff was sexually and physically abused by their grandfather, between the ages of 4 and 7. (Tr. 312-14). Plaintiff had a lot of conflict with her mother, leading her to move to Missouri to live with her father when she was 14. When she was 18, she

was held up at gunpoint while working in a clothing store. When she was 28 years old, she was admitted to a treatment center where she was diagnosed with depression and PTSD. She was unable to maintain employment, due to physical and psychiatric issues, and had married and divorced five times. Plaintiff's sister reported that plaintiff's ability to cope had deteriorated in the preceding four years, leading her to give away her belongings in order to reduce her stress. Participating in a two-way conversation "derailed" plaintiff and caused her great frustration. Her behavior had changed to the extent that her sister wondered if she suffered from schizophrenia.

The record also includes a letter from a participant in the Piedmont Family Counseling Center day treatment program that plaintiff attended. (Tr. 311). The letter writer reported that plaintiff displayed anxiety in a number of circumstances, such as being instructed by staff members or participating in the weekly trips organized by the counseling center. In addition, plaintiff became "nervous" unless everything "was in its place."

Plaintiff received unemployment benefits from the State of Nevada for the third quarter of 2012 through the second quarter of 2013. (Tr. 265-66).

## B. **Testimony at September 19, 2014 Hearing**

Plaintiff was 52 years old at the time of the hearing. (Tr. 82). She lived alone in an apartment in what she described as disability housing. (Tr. 106-07). She had a driver's license but did not have a car. She used a scooter to ride to the store near her home and, occasionally, to a grocery store 22 miles away.

Plaintiff completed three years of college and earned a manicurist's license. She started working as a heavy equipment operator in 1991, driving trucks in the

gold mines.[2] The "jarring" she sustained while driving caused compression fractures in her spine. (Tr. 83-84). She stopped working in October 2011 when her depression and PTSD worsened. At first these conditions forced her to leave work early, but ultimately they caused her to be unable to get up to go to work. Plaintiff was exhausted and was not "clear minded." (Tr. 88).

Plaintiff attended the Piedmont Family Counseling Center in Kennett, Missouri, four days a week. She was paid to do light cleaning for two hours each week. When asked whether she would be able to perform such work on a fulltime basis, she testified that her physical and psychiatric conditions would prevent her from meeting her commitments. (Tr. 90). She identified her fear of making mistakes — a component of her PTSD — as the most significant barrier to maintaining employment. She also had panic attacks, during which her body felt tense and vibrated, she became choked up, and she was unable to breathe or speak. These panic attacks could be caused by a change in the topic of conversation. Plaintiff met with a case manager once a week to help her stay focused on her treatment plan and cope with her constant fears of making a mistake or getting into trouble. (Tr. 93). She took medication to treat PTSD and severe depression and a sleep aid to deal with nightmares and insomnia. (Tr. 95). The medications had reduced the nightmares, but she continued to experience flashbacks. She testified that she just didn't seem to be able to function anymore and that her family and children could not "handle" her. (Tr. 113).

---

[2] Plaintiff testified that she also worked as a drug and alcohol abuse technician, providing one-on-one support and group training to clients. (Tr. 84). According to her earnings records, plaintiff worked in a number of different industries, including a fast-food restaurant, limousine companies, and a mortuary. (Tr. 253-62).

Plaintiff testified that she generally slept three or four hours a night. When she was working, she struggled to stay awake and not nod off. A recent sleep study revealed that she had obstructive sleep apnea. She had an appointment for another sleep study and to be fitted for a CPAP mask. (Tr. 111-12).

In January 2014, plaintiff began taking medication for diabetes. Although her condition had stabilized with medication and an alteration in her diet, she experienced daily episodes of flushing and poor vision. She testified that she had a service dog to alert her when her blood sugar was out of balance. (Tr. 97-99).

Plaintiff sustained a traumatic injury in 2009 when she fell off a horse. The reins wrapped around her left bicep, causing a violent jerking of her arm and injury to the brachial plexus. The reins then wrapped around her wrist and "degloved" a portion of her left hand. (Tr. 100-101). Her arm was paralyzed for three months. She had physical therapy for 6 months following the accident, but her left arm remained weaker and smaller than her right arm and she had a very weak grip. After a nerve conduction study in early 2014, her primary care physician told her that her "muscles were not getting the communication they need."  (Tr. 102-03). She testified that she had constant back pain due to her prior injuries and muscle spasms. The pain fluctuated in intensity between 3 and 10 on a 10-point scale. Her pain was aggravated by holding her arms out in front, such as when washing dishes, sitting or standing too long, and sleeping. (Tr. 99-100).

Plaintiff identified other physical pains: She had severe bunions which caused pain if she wore a closed shoe. She also had a growth on one foot that required lancing once a month. (Tr. 103-04). On occasion a rib moved out of place, causing severe pain. (Tr. 105-06). She experienced "big chest pains" that radiated into her

shoulders and jaw and which caused her to worry that she was having a heart attack. (Tr. 106). Riding the scooter caused unspecified pain. (Tr. 107).

Plaintiff testified that when she awoke in the morning, she walked her dog, ate her breakfast, and then got ready for the day. The van from the Family Counseling Center picked her up by 8:30 a.m. four days a week. While there, she attended groups. Over time she had learned to cope with the other people in the groups. (Tr. 110-11).

Plaintiff testified that she was took Metformin and Victoza for diabetes, cholesterol medication, the muscle relaxer Robaxin, ibuprofen, the antidepressant Zoloft, and Trazadone for sleep. (Tr. 114).

Vocational expert J. Stephen Dolan testified that plaintiff's past work as a substance abuse service aide was classified as skilled, light work and her work as a heavy equipment operator was classified as unskilled, heavy work. (Tr. 119-20). Mr. Dolan was asked to testify about the employment opportunities for a hypothetical person who was limited to performing work in the light exertional range, with the additional limitation of performing only simple routine tasks that did not involve interaction with the general public. Mr. Dolan testified that such an individual would not be able to perform plaintiff's past relevant work. (Tr. 120). However, other suitable jobs were available in the state and national economy, including small product assembler, housekeeping cleaner, or hand packager. (Tr. 121). These jobs were also suitable if the individual was further limited to working primarily with objects rather than people and only occasional contact with co-workers and supervisors. (Tr. 123). However, an individual whose conditions caused her to be off-task 20 percent of the workday would not be able to perform

the assembler and packager jobs, and the number of housekeeping cleaner jobs available in the Missouri economy would decrease from 20,000 to 5,000. Limiting the hypothetical individual to sedentary work narrowed the available occupations to sedentary unskilled assemblers. (Tr. 124). Employers would not tolerate more than two unexcused absences in a month or repeated tardiness. (Tr. 122).

In response to questioning by plaintiff's counsel, Mr. Dolan testified that the identified occupations could be performed with a service animal present to the extent that an employer permitted it. Imposing additional restrictions on the hypothetical individual's ability to walk did not reduce the occupations available; however, a requirement that the individual elevate her legs to waist level, outside normal breaks, would eliminate all light and sedentary work. (Tr. 126-27).

## C.  Relevant Medical Records

In March 2011, plaintiff was admitted to a hospital in Nevada with complaints of chest pain, dyspnea, diarrhea, and dizziness. She reported experiencing three episodes of nondescript chest pain, with vague shortness of breath. Blood tests, x-rays and electrocardiogram were all negative and she was discharged the following day with instructions to follow up with her primary care physician. (Tr. 329-33). Plaintiff was being treated for depression with Lexapro at the time of this admission.

The next medical record dates from October 17, 2011, when plaintiff presented to the emergency room seeking medication to treat her depression, which she described as mild. (Tr. 320-27). She was not experiencing appetite loss and she had no suicidal or homicidal ideation, no hallucinations, and was not experiencing anxiety, confusion or agitation. On examination, she was unkempt

with dirty clothes and matted hair. However, her affect was normal, her speech was within normal limits, and she was not in any apparent distress. She denied having muscle aches or weakness, back or chest pains, or difficulty breathing. She had no difficulty with ambulation and her extremities exhibited normal ranges of motion. She was stable and had good social support. She stated that she wanted medication to improve her sleep. She was provided with 5 Ativan pills and discharged with instructions to follow up with her primary care physician before returning to work. The record contains no evidence of further treatment until May 16, 2012, when she presented to the emergency room in Nevada with an apparent panic attack. (Tr. 318). After waiting 90 minutes, she left without being seen.

On May 30, 2013, plaintiff made a visit to a social services office in Poplar Bluff, Missouri. In a moment of frustration, she said, "I would be better off if I was suicidal,' a statement that she later explained was sarcastic. (Tr. 353). Later that day, emergency responders came to her home and transported her to the emergency room, where she was given Vistaril for severe anxiety/agitation. When interviewed, she denied suicidal or homicidal ideation, but reported a long history of depression. She was under a great deal of stress due to poor finances and conflict with family members and requested admission to the behavioral health unit. On examination, she was found to be appropriately groomed, alert and oriented, with good attention and concentration. Her affect was anxious and restricted. She described her mood as "jittery, good, a little agitated." Her speech was clear, coherent, loud, and pressured. She had no hallucinations or paranoid ideations and denied all suicidal and homicidal thoughts. Her memory was grossly intact; her insight and judgment were borderline. (Tr. 354). She was assessed with substance-

induced mood disorder with suicidal ideations and cannabis dependence; PTSD by history, rule out major depressive disorder; anxiety disorder with panic attacks; and nicotine dependence. Her current Global Assessment of Functioning (GAF) was estimated to be 35-40. Plaintiff was admitted to the behavioral health unit, with the expectation that she would remain for a few days to stabilize with antidepressant medicines. Plaintiff agreed to a trial of Celexa and then insisted on being discharged. (Tr. 355). After determining that she did not meet the criteria for involuntary commitment and had a stable living situation, the staff discharged her home. (Tr. 349). She was directed to follow up at the Kneibert Clinic.

Plaintiff underwent a disability examination at the Kneibert Clinic on June 26, 2013. (Tr. 383-86). Plaintiff's issues included pain in her back, neck, and arm; frequent paresthesias; possible history of diabetes, high cholesterol, and high blood pressure; mental health issues, including PTSD, depression, and panic attacks; poor vision; and bad teeth. She complained of chest pain, musculoskeletal symptoms, and malaise. On physical examination, she was in no acute distress and had normal reflexes, coordination, muscle strength and tone. She was taking Celexa for depression. The examiner characterized plaintiff as disabled and in need of extensive evaluation and prescriptions.

Plaintiff appeared for a consultative examination on July 30, 3013. (Tr. 390-97). She reported having numerous mental health problems, including depression, panic attacks and PTSD. Celexa provided some benefit, but she still had panic attacks every morning and "develops psychosis quite often with hallucination." (Tr. 390). She also complained of pain from her neck to her lower back and her hips, and in her left anterior chest, left arm, shoulders, and feet. She suffered from

occasional headaches and dizziness. On examination, she "complained a lot" but was not in acute distress. (Tr. 393). There was no swelling or decreased range of motion in any major joints. She had pain in her neck and back with extension and flexion, but her straight leg raising test was normal. She was able to bear her full weight on each leg, walk on heels and toes, squat, get on and off the examination table without significant problems, and her gait was stable. She had mild callus formations on the bottoms of her feet. A neurological examination was normal, with the exception of decreased sensation in her left hand. Id. (examination "nonspecific including sensory, motor, reflex and muscle mass"). An x-ray of the lumbar spine showed mild scoliosis and degenerative joint disease at multiple vertebrae and the sacroiliac joints.

A psychological evaluation was completed on September 9, 2013. (Tr. 398-403). Plaintiff reported that she suffered from PTSD, panic attacks, and depression, and experienced multiple flashbacks regarding past traumas. When anxious, she was unable to concentrate and became agitated, with shortness of breath, chest pain, and elevated blood pressure. She described feeling helpless and hopeless, with a varied appetite and sleep disturbance. She stated that she was not receiving any mental health treatment or taking any medications. On examination, plaintiff was generally cooperative and agreeable, but needed redirection. She was "quite verbose" with slight pressure of speech, and seemed "somewhat overdramatic," with lability of emotions. (Tr. 401-02). Her verbalizations and organization of thought were somewhat loose. She was oriented and displayed no difficulty with immediate or delayed recall tasks. She was unable to complete the serial 7s test but could spell world backwards. She had no difficulties with the language portion

of the examination, displayed no delusions or hallucinations, and did not express suicidal or homicidal ideation. The examiner concluded that plaintiff was experiencing a moderate amount of emotional distress. She presented or described signs and symptoms consistent with depression, PTSD, and anxiety. She required medication and concrete, behaviorally-oriented psychotherapy. The examiner opined that plaintiff was capable of understanding, following, and remembering simple instructions. Her ability to sustain concentration and persistence on simple tasks was fair, as was her ability to interact in a one-to-one structured setting.

An orthopedic evaluation was completed on September 18, 2013. (Tr. 405-06). On physical examination, it was noted that plaintiff did not have any pelvic tilt or discrepancy in leg length. She had full range of motion of the neck and lumbosacral spine and was almost able to touch her toes when bending forward. She experienced pain in her calves when bending over, which was described as "nonanatomical." (Tr. 406). She completed straight leg raising to 80 degrees without much pain or discomfort. Tests for sacroiliac or hip joint pathology and nerve compression were all negative. She did not have any atrophy or muscle spasms, though she did have some pain on palpation. She had some pain in her hips, possibly due to bursitis. X-rays showed a small lack of the normal lordosis of the cervical spine. She did not have narrowing of the foramens or disc spaces or scoliosis. The examiner's clinical impression was of moderate cervical and lumbar myofascitis.

On October 4, 2013, James W. Morgan, Ph.D., completed a Psychiatric Review Technique. (Tr. 134-36; 150-52). Based on the record, Dr. Morgan concluded that plaintiff met the criteria for anxiety disorders (primary), affective

disorders (secondary) and substance addiction disorders. In a Mental Residual Functional Capacity Assessment, (Tr. 139-41; 156-58), Dr. Morgan found that plaintiff was moderately limited in the abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; get along with coworkers and peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. Dr. Morgan concluded that the totality of the evidence suggested that plaintiff could perform simple routine tasks away from the public.

Also on October 4, 2013, Amy Franklin completed a Physical Residual Functional Capacity Assessment.[3] (Tr. 137-39; 153-55). Based on a review of the medical records, Ms. Franklin determined that plaintiff had the capacity to lift or carry up to 20 pounds occasionally and up to 10 pounds frequently, and could walk, sit, or stand bout 6 hours in an 8-hour workday. She had limitations on her ability to stoop, kneel, crouch, and crawl, due to degenerative disc disease of the lumbar spine.

On December 13, 2013, plaintiff was evaluated at the Family Counseling Center for admission to the Community Psychiatric Rehabilitation program. (Tr. 495-97). She reported that she was living in a shed next to the apartment of a friend who allowed her to use his bathroom. She stated that she needed help

---

[3] Ms. Franklin is a Single Decisionmaker (SDM). Missouri is one of 20 states in which nonmedical disability examiners are authorized to make certain initial determinations without requiring a medical or psychological consultant's signature. See Office of the Inspector General, Audit Report, Single Decisionmaker Model — Authority to Make Certain Disability Determinations without a Medical Consultant's Signature (A-01-12-11218) (Aug. 2013) (available at http://oig.ssa.gov/audits-and-investigations/audit-reports/A-01-12-11218).

coping with stress, becoming more independent, and getting on disability. She denied any suicidal or homicidal thoughts. She described herself as easily distracted with poor memory. She did not like being in crowded places but was able to do her own grocery shopping.

Plaintiff had a new-patient evaluation by Joseph Toney, D.O., at the Piedmont Family Clinic on January 17, 2014. (Tr. 455-58). She reported that she had been taking Celexa since her hospitalization in May 2013 and was doing "fairly well," despite financial and housing issues. (Tr. 456). She was scheduled to see a psychiatrist the following week. Blood tests established that she had elevated blood sugars and cholesterol. (Tr. 453). On follow-up on January 22, 2014, she complained of chronic neck pain and a corn on her left foot. She was prescribed cholesterol medication and Metformin to treat her diabetes and was provided a glucometer and blood glucose log. She was instructed on wound care to deal with the corn on her left foot. (Tr. 453).

The following day, on January 23, 2014, plaintiff was seen for a psychiatric crisis contact by Juan Carlos Salazar, M.D., at the Family Counseling Center. (Tr. 493-94). She reported that, after spending most of her life in Nevada, she moved to Pennsylvania to be closer to her children, but she had conflict with them. She was on her way back to Nevada when she decided to stay in Missouri, where she grew up and a brother still resided. She reported that she had stopped taking Celexa in mid-2013 because she did not have insurance. She presented as calm with slightly decreased psychomotor activity. Her mood was depressed and her affect was dysphoric. She denied homicidal and suicidal ideation and there was no evidence of psychosis. Plaintiff was prescribed Celexa and Trazadone.

On February 24, 2014, plaintiff told Dr. Toney that she was doing well, overall. (Tr. 449-50). On examination, she was alert, oriented, and conversational, in no acute distress. She was seeing a psychiatrist and seemed to be "okay." She wanted a nerve conduction study of her left arm, due to concerns of weakness and incoordination. She also had back and chest pain.

Plaintiff underwent a cardiac study in March 2014 which showed normal left ventricular size and systolic function, a small fixed apical defect, and no reversible ischemia. (Tr. 426). A second cardiac study in May 2014 found normal perfusion and no evidence of ischemia or infract. (Tr. 425, described as "a low risk scan"). A nerve conduction study of plaintiff's left arm was normal. (Tr. 506).

Dr. Salazar completed a psychiatric evaluation of plaintiff on March 11, 2014. (Tr. 490-92). He diagnosed plaintiff with major depressive disorder, recurrent, moderate to severe. Her GAF score was 55. Plaintiff reported that she had some improvement since resuming the Celexa but she still had significant elements of depression. Her sleep had improved somewhat with Trazadone and the acquisition of a puppy. On examination, plaintiff was cooperative and displayed a normal level of psychomotor activity. She reported having depressed mood and her affect was dysphoric. For the most part, she displayed logical, coherent, and goal-directed thought processes. She had no suicidal or homicidal ideation and there was no evidence of perceptual disturbance. Dr. Salazar increased the dosage of plaintiff's Celexa and recommended that she continue to participate in the Community Psychiatric Rehabilitation Program. In April 2014, Dr. Salazar certified that plaintiff was disabled for the purposes of a housing program, and in May 2014, he signed a prescription for her to have a therapy dog. (Tr. 477, 479). He also switched plaintiff

to Zoloft because Medicaid would not cover Celexa at the increased dose. (Tr. 487). In June 2014, Dr. Salazar increased the dosage of both Zoloft and Trazadone. (Tr. 484). On follow-up, plaintiff reported significant improvement. She was much less depressed and her sleep had improved. She enjoyed her new apartment and dog and was more active and interactive. On examination, plaintiff was cooperative and oriented with a depressed mood. Her thought process was goal-directed, linear, and coherent. Her judgment and insight were fair. (Tr. 481).

In June 2014, Dr. Toney described plaintiff's reports of chest pain as "very atypical" and likely due to stress. (Tr. 438). Her blood glucose levels were still elevated and he prescribed Victoza in addition to Metformin. On examination, he noted that she had some tight paraspinal musculature. X-rays showed significant arthritic changes and a compression fracture. He referred her to a pain management clinic for evaluation.

Also in June 2014, podiatrist Zackwrie Parr treated plaintiff for an infected ingrown toenail and a stage I ulcer on the bottom of her left foot associated with slight plantar flexion. (Tr. 429-30). Dr. Parr determined that plaintiff had early diabetic neuropathy that caused tingling and burning but did not interfere with normal activity. She also had plantar fasciitis and bunions, with some joint swelling and inflammation. Dr. Parr prescribed Cipro for the toenail and ammonium lactate for the ulcer. On follow-up, plaintiff was diagnosed with intractable plantar keratosis, which had responded somewhat to the ammonium lactate but required further attention.  (Tr. 428). Dr. Parr again debrided the ulcer and explained that the plantar flexion caused pressure problems. Plaintiff was directed to return one month later.

On July 2, 2014, Dr. Toney noted that plaintiff's blood glucose was much improved with the addition of Victoza. She had had no further chest pain. Plaintiff was described as alert, oriented, and conversational, and was not in acute distress. (Tr. 434).

Plaintiff was evaluated for complaints of neck and back pain at the Advanced Pain Center in July and August 2014. (Tr. 471-75, 462-66). She rated the pain at level 6 on a 10-point scale. On examination, she had normal range of motion of the cervical and thoracic spine, but was symptomatic at the lumbar/sacral spine, with moderate tenderness at the facet joints on palpation. Her muscle strength, reflexes, and sensation were all normal. An MRI of the lumbar spine showed normal vertebral alignment with mild degenerative changes and multilevel stenosis. (Tr. 467). Plaintiff was prescribed ibuprofen and the muscle relaxer Robaxin and was given injections. (Tr. 465, 475). On follow-up, plaintiff rated her pain at level 4. (Tr. 462).

On July 23, 2014, Grete Lovell, BSW, of the Family Counseling Center, completed a Medical Source Statement. She opined that plaintiff was extremely limited in seven categories of work-related abilities, including the abilities to understand, remember and carry out detailed instructions; make simple work-related decisions; maintain attention and concentration for extended periods; comply with a work schedule; and accept instruction. Ms. Lovell further opined that plaintiff was markedly limited in an additional 10 categories of work-related abilities, including the abilities to sustain a work routine; work in proximity to and get along with others; interact with the public; and respond appropriately to changes in the work setting.

On July 29, 2014, Sharon Hamby, plaintiff's supervisor at the Family Counseling Center, completed an Employer Questionnaire. (Tr. 268). Ms. Hamby described plaintiff's job as assisting in the kitchen for two one-hour periods each week. Plaintiff needed to take breaks every half hour and was unable to lift, squat, or bend over. Plaintiff related appropriately most of the time, but was unable to work if there were a lot of people around. Ms. Hamby opined that plaintiff would not cope well with changes.

On August 5, 2014, Dr. Parr completed a medical statement. (Tr. 460). He stated that plaintiff had chronic severe pain and problems with her left foot and that her capacity to stand was limited by deformities. He opined that she could stand for two hours at one time, but was unable to walk a block at a reasonable pace or enough to shop. She needed to elevate her legs occasionally.

A sleep study in September 2014 found that plaintiff had mild sleep apnea. (Tr. 503-04). It was recommended that she use a CPAP machine, reduce her weight, and avoid alcohol or other central-nervous system depressants.

### III.  **The ALJ's Decision**

In the decision issued on December 8, 2014, the ALJ made the following findings with respect to plaintiff's applications for a period of disability, disability insurance benefits, and supplemental security income:

1.    Plaintiff met the insured status requirements of the Social Security Act on September 30, 2014.

2.    Plaintiff did not engage in substantial gainful activity since October 17, 2011, her alleged onset date.

3.    Plaintiff had the following severe impairments: diabetes mellitus, early diabetic neuropathy, degenerative disc disease of the lumbar and thoracic spine, mild sleep apnea, depressive disorder, anxiety, and PTSD.

4. Plaintiff did not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b), limited to simple, routine tasks that do not involve interaction with the general public.

6. Plaintiff was unable to perform any past relevant work.

7. Plaintiff was 49 years old on the alleged onset date, and was classified as a younger individual; at the time of the decision, she was classified as closely approaching advanced age.

8. Plaintiff had a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocation Rules as a framework supports a finding that plaintiff is not disabled, whether or not he has transferrable job skills.

10. Considering plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform.

11. Plaintiff has not been under a disability within the meaning of the Social Security Act from October 17, 2011, through the date of the decision.

(Tr. 16-24).

## IV. Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson

v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D), (d)(1)(A);  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five.  Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations."  Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may

cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff argues that the ALJ's credibility determination was not supported by substantial evidence and that he improperly weighed the opinions of podiatrist Zackwrie Parr and supervisor Sharon Hamby.

## A. Credibility

The ALJ found that plaintiff's subjective complaints were not entirely credible. Credibility determinations are the province of the ALJ, and as long as "good reasons and substantial evidence" support the ALJ's evaluation of credibility, the Court will defer to the ALJ's decision. Julin v. Colvin, 826 F.3d 1082, 1086 (8th Cir. 2016) (quoting Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005)). An ALJ may

decline to credit subjective complaints "if the evidence as a whole is inconsistent with the claimant's testimony." Id. (quoting Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006)). The Court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

In evaluating a claimant's subjective complaints, the ALJ is required to consider all of the evidence, including objective medical evidence, the claimant's work history and the factors set out by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984): "(1) the claimant's daily activities; (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the dosage, effectiveness and side effects of any medication; and (5) the claimant's functional restrictions." Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004) (citing Polaski, 739 F.2d at 1322). "When rejecting a claimant's complaints of pain, the ALJ must make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors." Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012) (citation omitted). "[A]n ALJ may not discount a claimant's subjective complaints solely because the objective medical evidence does not fully support them." Id. (alteration in original; citation omitted).

Plaintiff argues that in his assessment of her credibility the ALJ incorrectly considered her receipt of unemployment benefits. "Applying for unemployment benefits adversely affects credibility, although it is not conclusive, because an unemployment applicant must hold himself out as available, willing and able to work." Smith v. Colvin, 756 F.3d 621, 625 (8th Cir. 2014) (internal quotation and citation omitted); see also Milam v. Colvin, 794 F.3d 978, 984 (8th Cir. 2015) (by

seeking and obtaining unemployment benefits, plaintiff evinced a willingness and ability to work, which contradicts her claim of disabling pain). Plaintiff contends that there is no evidence in the record that she held herself out as able to perform work at any exertional level above sedentary.[4] However, as discussed below, there is no evidence in the record that plaintiff's physical capacity was limited to sedentary work during the period from the third quarter of 2012 through the second quarter of 2013 when she received unemployment. The ALJ did not err by considering plaintiff's unemployment benefits when assessing her credibility.

The ALJ's credibility determination is supported by inconsistencies between her subjective complaints and the medical record. Plaintiff alleges a disability onset date of October 17, 2011, when she presented to an emergency room with complaints of depression. However, her clinical presentation on that date would not support a finding of disability: she denied suicidal and homicidal ideation; she had no anxiety and was not confused or agitated. She denied experiencing any hallucinations. On examination, her affect was normal and she was calm and cooperative. In addition, she denied experiencing any physical pain. She merely wanted temporary medication to hold her over until she saw her physician. She was discharged with five Ativan tablets and instructions to follow up with her physician. Furthermore, it was not until May 2013 that plaintiff again sought treatment for her allegedly disabling conditions.[5] The long period of time that plaintiff went without treatment undermines her claim that during that interval she suffered medically determinable impairments that precluded employment. See Wright v. Colvin, 789

---

[4] She argues that she would be disabled pursuant to the Medical-Vocational Guidelines if she were limited to sedentary work. [Doc. #11 at 11].

[5] The sole medical record between October 2011 and May 2013 is for a visit plaintiff made to an emergency room in May 2012 with complaints of a panic attack. She left without being seen. (Tr. 318).

F.3d 847, 854 (8th Cir. 2015) (complaints of disabling pain are also undercut by the eight-month period during which plaintiff sought no medical care). And, once plaintiff began regular treatment, both her depression and diabetes improved with medication. A medical condition cannot be considered disabling if it can be controlled with medication or treatment. Medhaug v. Astrue, 578 F.3d 805, 816 (8th Cir. 2009) (citation omitted). Similarly, plaintiff's back and neck pain improved with treatment with a muscle relaxer and ibuprofen. (Tr. 462). The lack of narcotic medications to control pain supports an ALJ's determination that allegations of disabling pain are not credible. Smith v. Colvin, 756 F.3d 621, 626 (8th Cir. 2014).

Objective medical findings also support the ALJ's conclusion that plaintiff's subjective complaints were not wholly credible. For example, she claims that her left arm is weaker and smaller than her right arm and that she has a weak grip. Numerous physical examinations disclosed no discrepancy between her left and right arms in muscle mass, range of motion, or grip strength. (Tr. 323, 364, 385, 394, 406). And, although plaintiff had some alteration in sensation, a nerve conduction study completed in 2014 was unremarkable. (Tr. 506). In addition, despite allegations of disabling back and foot pain, plaintiff generally had full range of motion and a normal gait. (Tr. 323, 364, 393-94, 405-06, 473). Similarly, cardiac studies were unremarkable and a sleep study indicated only mild sleep apnea. Finally, in 2014, an MRI of the spine in 2014 showed mild degenerative changes.

The ALJ noted that plaintiff received conservative treatment. (Tr. 20). This is an appropriate factor for the ALJ to consider in making a credibility determination. See Smith v. Colvin, 756 F.3d 621, 626 (8th Cir. 2014) (citing as factor in ALJ's

credibility determination plaintiff's "essentially routine and/or conservative" treatment). Plaintiff argues that the ALJ improperly characterized her treatment as conservative without providing an explanation, citing <u>Cornell v. Colvin</u>, No. 3:14-CV-05059-NKL, 2014 WL 7238006, at *4 (W.D. Mo. Dec. 17, 2014). At issue in <u>Cornell</u> was the ALJ's incorrect characterization of the claimant's extensive history of treatment with psychiatric drugs as "conservative." Plaintiff does not identify any specific treatment that she underwent that she believes was incorrectly characterized as conservative.

The ALJ properly assessed the medical evidence and plaintiff's credibility.

## B. <u>Opinion Evidence</u>

Plaintiff argues that the ALJ did not properly assess the opinions of podiatrist Zackwrie Parr and supervisor Sharon Hamby.

Plaintiff first argues that the ALJ improperly failed to give Dr. Parr's opinion controlling weight as a treating physician. Dr. Parr treated plaintiff twice in June 2014. In August 2014, he opined that she needed to elevate her legs "occasionally" during an 8-hour work day, was limited in her ability to walk, and suffered from severe pain. The ALJ concluded that these limitations were not supported by objective medical evidence. (Tr. 21-22).

A treating physician's opinion is given controlling weight if it is properly supported by medical evidence and is not inconsistent with other substantial evidence. <u>Wildman v. Astrue</u>, 596 F.3d 959, 964 (8th Cir. 2010). A treating physician's opinion does not automatically control, however, because the record must be evaluated as a whole. <u>Goff v. Barnhart</u>, 421 F.3d 785, 790 (8th Cir. 2005). Defendant contends that the short length and duration of Dr. Parr's treatment

precludes treating-physician status. The Court need not reach this issue, however, because other factors support the ALJ's decision to discount Dr. Parr's assessment of plaintiff's limitations. Dr. Parr did not note any limitations in plaintiff's ability to stand or walk when he saw her in June 2014. And, by the second visit, plaintiff's condition had improved slightly with treatment. Thus, Dr. Parr's statement in August 2014 is not consistent with his own treatment notes. Furthermore, plaintiff was seen by her primary care physician and the pain management specialist in July and August 2014. Neither provider noted any impairment in plaintiff's ability to stand or walk. Thus, the ALJ did not err by giving little weight to Dr. Parr's opinion.

Plaintiff also contests the ALJ's assessment of Ms. Hamby's statement. The ALJ gave great weight to Ms. Hamby's opinion that plaintiff was restricted in her ability to work around large numbers of other people. Plaintiff argues that he should also have given substantial weight to her assessment that she needed to take breaks during her one-hour shift if she had to do any bending or lifting or had to stand the whole time. These limitations, if credited by the ALJ, would have limited plaintiff to sedentary work. However, with the exception of Dr. Parr (whose opinion the ALJ properly discounted), no medical provider placed such restrictions on plaintiff's physical capacity and the objective medical findings are not consistent with the limitations prescribed by Ms. Hanby.

## VI. **Conclusion**

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 21st day of April, 2017.